PHILIP J., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14193.

Supreme Court of Alaska.

Dec. 2, 2011.

---

2. *Id.* at 897.

3. *Id.* at 897 n. 14.

4. *Id.* at 897.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Philip is the father of seven children who were adjudicated to be children in need of aid. On appeal, he claims that his right to due process was violated because he was unaware that the State would seek adjudication findings at the conclusion of a hearing that started as a contested probable cause (temporary custody) hearing. He also argues that he was denied due process because he was not allowed to present a closing argument. We hold that Philip was not denied due process because he had notice that the State was seeking adjudication findings, because he had an opportunity to be heard on adjudication, and because he was not denied the opportunity to deliver a closing argument.

## II. FACTS AND PROCEEDINGS

### A. Facts

Philip J. and Georgina J. are the biological parents of seven children: Sophie, Anne, John, Katherine, Nellie, Olivia, and Alexandra.[1] The children are members of the Asa'carsarmiut Tribe and are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2]

The Office of Children's Services (OCS) first became involved with this family in 2004 when Philip and Georgina both became extremely intoxicated; Philip fired a rifle in the home and held the family hostage for three hours.

Several additional reports of harm were received between 2005 and 2010. In April 2005, Philip and Georgina became intoxicated on homebrew and Philip assaulted Georgina, giving her two black eyes. On the same evening, Philip was charged with sexually

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

---

1. Pseudonyms are used for all family members.

2. 25 U.S.C. §§ 1901–1963 (2011).

assaulting a female visitor at the home. The children were present in the home at the time. In July 2008, an OCS investigation found parental substance abuse, lack of supervision by both parents, and exposure of the children to domestic violence. In October 2008, OCS received another report of harm; it investigated and found that the parents were abusing substances, exposing their children to the elements, and exposing their children to domestic violence. OCS received and substantiated two similar reports of harm in September 2009. In November 2009, OCS received and substantiated a report of physical abuse and neglect.

The incident that gave rise to this appeal was triggered by events that began in January 2010. OCS received a report from the Indian Child Welfare Act Program of the Asa'carsarmiut Tribal Council that Philip had sexually assaulted Anne and tried to sexually assault Sophie. In a written statement, Anne disclosed sexual abuse by Philip. She reported that Georgina tried to stop him, that Philip became angry and began throwing things around the house, that he broke off a table leg, and that he beat Georgina with it. The OCS report stated: "Girls are afraid their mother will get beat up by their father ... if they tell anyone." Philip was arrested by the Alaska State Troopers and found guilty of assault in the fourth degree. He was sentenced to 270 days of incarceration, with 210 days suspended.

Alaska State Trooper Steven Kevan interviewed Georgina in February 2010 while Philip was still in custody. Georgina stated that Philip had beaten her for several years but she was afraid to report it. She described an incident that took place on February 8, 2010, in which Philip became angry and "went after" two of their children. Georgina was holding their youngest child at the time—a one-year-old baby. According to Georgina, when she stepped in front of Philip to protect the two other children, Philip began punching her in the face, head, and sides, and kicking her in the legs. Georgina also reported that Philip had threatened to kill her and the children and that she was afraid he would do so.

After the incidents in early 2010, Georgina and her mother sought a short-term and long-term protective order from Asa'carsarmiut Tribal Court. By the time Philip was released from jail in April 2010, a short-term protective order had been entered, but not a long-term order. Because Philip returned to the home after his release, a social worker offered to take Georgina and the children into a domestic abuse shelter. Georgina declined. OCS then told Georgina that if she did not go to the shelter with her children, the children would be removed from the home. When Georgina still refused to take the children to a shelter, OCS took the children into emergency custody on April 22, 2010 and placed them into foster care. Both parents were present for an emergency temporary custody hearing on April 23, 2010. The magistrate recommended approval of the State's emergency petition for temporary custody at the conclusion of the temporary custody hearing.

On April 30, 2010, the tribal court issued a final protective order against Philip. It ordered him not to come within 500 yards of his children and banished him from being within the boundaries of the Asa'carsarmiut Tribe, including Mountain Village, where the family's home was located.

Georgina had some visitation with the children while they were placed in foster care, but she soon moved to a neighboring village, Alakanuk, to live with Philip. In August 2010, Georgina was flown into Anchorage and taken to Alaska Native Medical Center. She had two broken arms and bruising all over her body but would not say who assaulted her. Philip testified that he discovered her, beaten, on his boat; he did not report the incident to the police.

## B. Proceedings

OCS filed an emergency petition for adjudication of children in need of aid and for temporary custody on April 23, 2010. The petition requested an "adjudication and order of disposition committing the children to the custody of the Department of Health and Human Services for a period not to exceed two years." The superior court agreed with the magistrate's recommendation to approve

the State's temporary custody petition. On May 13, the superior court issued a pretrial order setting a series of deadlines in July. The order also scheduled an "adjudication and disposition trial" for the week of July 27, 2010. Philip filed a motion for a contested probable cause (temporary custody) hearing[3] and a motion to continue the adjudication hearing, both of which were granted. In an order issued July 12, a contested probable cause (temporary custody) hearing was scheduled for August 25, 2010. The adjudication hearing was rescheduled to begin September 28, 2010.

On June 28, OCS filed a notice that it would call an expert witness to testify that the children would suffer serious emotional or physical damage if returned to their parents' custody. And on August 11, OCS submitted a notice of its intent to:

> seek findings by a preponderance of the evidence; 1) that the children are children in need of aid under AS 47.10.011, and 2) that the department has made active efforts to provide remedial services and rehabilitative programs as required by 25 U.S.C. § 1912(d) at the contested hearing scheduled for August 25, 2010.

OCS's pretrial memorandum for the August 25 hearing reiterated that it sought findings "based on a preponderance of the evidence that the [children] are children in need of aid...." It also stated that the State sought findings by "clear and convincing evidence that the children are likely to suffer serious emotional or physical damage if left in the custody of the parents." At the August 25 hearing, OCS referred to this written notice of intent, and restated that it would be seeking a "preponderance of the evidence finding." Counsel for Philip acknowledged that he understood that OCS would be seeking findings by a preponderance of the evidence.

The contested probable cause hearing began on August 25, but OCS only finished questioning three of its 14 witnesses by the end of the allotted time. Trooper Kevan was one of the witnesses who did testify that day, and an affidavit detailing his interview of

Georgina was admitted by stipulation of the parties. Anne also testified that day about the sexual assault allegations against Philip. Philip's counsel orally moved to strike Anne's testimony on the grounds that she was nonresponsive.

Near the end of the allotted time on August 25, the court inquired about the possibility of stipulating to probable cause and moving the case to the adjudication stage. Philip's counsel stated that his strongest argument against probable cause only applied to one of four subsections of AS 47.10.011 under which OCS sought probable cause. He agreed with the court that his pretrial memo had conceded probable cause as to AS 47.10.011(8).[4] The superior court set a telephonic "trial call" for September 28 and scheduled the continuation of the hearing for October 28–29 and December 3.

Numerous witnesses were presented at the continuation of the hearing. Among them, Sophie was called to testify about the allegations that Philip sexually assaulted her. Philip's counsel orally moved to strike the testimony of Sophie on the grounds that she was unable or unwilling to respond to his questions on cross-examination, and that she should be deemed an "unavailable" witness as a result. The superior court granted Philip ten days to file a written brief in support of the motion. When no brief was received, the court issued a written order advising that Philip's counsel should be prepared to discuss the matter at the continuation of the hearing, on December 3.

The State presented expert testimony from Dr. Bruce Smith at the hearing on December 3. Dr. Smith testified regarding the psychometric testing he administered to the oldest three children. At the end of the December 3 hearing, OCS requested that the superior court:

> enter findings that the children are children in need of aid by a preponderance of the evidence ... [and] that active efforts have been made and they have not been successful ... to prevent the children's removal from the home and to remedy the

3. Contested temporary custody hearings are commonly referred to as "probable cause" hearings because the State must show probable cause that the children are in need of aid. *See* CINA Rule 10.

4. AS 47.10.011(8) pertains to conduct or conditions that expose children to mental injury.

safety threats within the home; that continued placement in the home is contrary to the welfare of the children. . . .

At the close of evidence on December 3, Philip's oral motion to strike the testimony of Anne and Sophie was still pending, but no written brief had been received. The court granted additional time for Philip to file a written motion, and the record shows it was received by the court on December 9. The State's opposition was filed December 17. No reply brief was filed, but Philip did file a motion to strike the State's response.

In February 2011, the superior court issued a written order striking Sophie's testimony but not striking Anne's testimony. The superior court found by a preponderance of the evidence that the children were children in need of aid under AS 47.10.011(6),[5] (8)(B)(i)-(iii),[6] and (9).[7] Philip appeals.

## III. STANDARD OF REVIEW

■ Whether due process rights are violated in a CINA case is a question of law that this court reviews de novo, adopting "the rule of law that is most persuasive in light of precedent, reason and policy."[8]

## IV. DISCUSSION

### A. The Superior Court Did Not Violate Philip's Right To Due Process By Entering Adjudication Findings After The Contested Hearing.

■ Philip claims that he did not have notice that the State would seek adjudication

findings at the conclusion of the hearing that began August 25 and ended December 3, 2010.[9] Philip points to the fact that the hearing set for August 25 was described as a "probable cause hearing" in the Order to Appear Telephonically issued August 23. Philip also notes that both the State and the court on other occasions referred to the hearing as one determining "probable cause."

■ "[D]ue process requires that any action involving deprivation of life, liberty or property by adjudication must be preceded by notice and opportunity for hearing appropriate to the nature of the case."[10] In *D.M. v. State*, the appellant argued that due process concerns were implicated when the State requested findings by clear and convincing evidence at the adjudication phase of a CINA case, and then used those findings at a termination trial.[11] In that case, the State did not give notice that it would seek findings by the heightened standard of proof until the outset of the adjudication hearing.[12] In holding that the mother's right to due process was not violated, we balanced the value of procedural safeguards against the private interest affected by the action.[13] We observed that a proceeding to terminate parental rights affects a private interest "of the high-

---

5. AS 47.10.011(6) pertains to physical harm.

6. AS 47.10.011(8) pertains to mental injury.

7. AS 47.10.011(9) pertains to neglect. The court also found the children, except John, were children in need of aid under AS 47.10.011(7) (sexual abuse). The parties later stipulated to vacate the determination under AS 47.10.011(7).

8. *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005) (internal quotations and citations omitted).

9. As a threshold matter, the State claims that because this case has only reached the adjudication stage, it is not yet ripe for appeal. Because Philip would have the right to file a petition for review even if he did not have the ability to appeal as a matter of right, we do not reach the State's ripeness argument. Alaska R.App. P. 402.

10. *In re Estate of Fields*, 219 P.3d 995, 1009 (Alaska 2009) (quoting *Aguchak v. Montgomery Ward Co.*, 520 P.2d 1352, 1356 (Alaska 1974)) (internal quotation marks omitted).

11. *D.M. v. State, Div. of Family and Youth Servs.*, 995 P.2d 205, 213 (Alaska 2000). The clear and convincing standard is used at termination proceedings, while adjudication hearings require merely a preponderance of the evidence that the child is in need of aid. *See* CINA Rule 15, 18.

12. *Id.* at 207.

13. *Id.* at 212–13 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

est order,"[14] but ultimately concluded that the mother failed to show actual prejudice.[15]

Here, the State gave explicit written notice of its intent to seek adjudication findings well in advance of the probable cause hearing that began on August 25. Because notice was given well in advance of the hearing, because the hearing was continued over the course of several months so that Philip had ample time to respond to the State's evidence, and because Philip has not shown that he was prejudiced by the State's request for adjudication findings at the conclusion of the probable cause hearing, we discern no due process violation.

### 1. Philip had notice that the State would seek adjudication findings.

Philip argues that he did not have notice that the State would seek adjudication findings at the conclusion of the hearing. We disagree. OCS filed a notice that it "intend[ed] to seek findings by a preponderance of the evidence; 1) that the children are in need of aid under AS 47.10.011, and 2) that the department has made active efforts to provide remedial services and rehabilitative programs as required by 25 U.S.C. § 1912(d) at the contested hearing scheduled for August 25, 2010." The State's written notice that it would "seek findings by a preponderance of the evidence" was effectively notice that it would seek findings sufficient to adjudicate the children in need of aid; CINA Rule 10 only requires a showing of probable cause at a contested temporary custody hearing.[16] The transcript of the August 25 hearing confirms the State's reiteration of its clear intention to seek adjudication findings. Immediately after the superior court referred to the hearing as a "probable cause

hearing," OCS corrected the court and reiterated that it would be seeking findings by a preponderance of the evidence. Also at the August 25 hearing, Philip's counsel affirmed that he understood that the State wanted the children to be evaluated by an expert in anticipation of adjudication. Dr. Bruce Smith, OCS's expert, interviewed the children on August 31, 2010.[17] His written report was filed with the court and served on Philip's counsel on October 11, 2010. Finally, at the close of the December 3 hearing, OCS expressly requested findings by a preponderance of the evidence that the children were in need of aid.

Philip is correct that the hearing set for August 25 was originally scheduled as a contested probable cause (temporary custody) hearing, but it is not uncommon for the State to seek adjudication findings at probable cause hearings, and there is ample evidence in the record to support the conclusion that Philip had been given fair and express notice that the State would seek adjudication findings. The State made this intention clear in its written filings and in its on-record statements. We find no due process violation in the State's request for adjudication findings at the conclusion of the subject hearing.

### 2. Philip did not show that he was prejudiced by a lack of notice that the State would seek adjudication findings.

Philip argues that he was prejudiced by lack of notice that the State would request adjudication findings. As explained, the superior court found by a preponderance of the evidence that the children were in need of aid under AS 47.10.011(6), (8)(B)(i-iii), and (9). Philip makes the bare assertion that he would have called additional witnesses or

**14.** *Id.* at 213 (quoting *In re J.L.F. & K.W.F.*, 828 P.2d 166, 170 (Alaska 1992)).

**15.** *Id.*

**16.** CINA Rule 10, which applies to temporary custody hearings, requires that "the court shall order the child returned to the home and dismiss the petition if the court does not find probable cause to believe that the child is a child in need of aid under AS 47.10.011." CINA Rule 10(c)(1). CINA Rule 15 governs adjudication hearings. Rule 15(c) provides that "[t]he Department has

the burden of proving by a preponderance of the evidence that the child is a child in need of aid."

**17.** The State gave notice in July that Dr. Bruce Smith would interview the children and prepare a report for adjudication. Dr. Smith ultimately testified on December 3. He described his interview of the oldest three children and the testing he administered to them. He also testified that he tried to interview Philip and Georgina, but they declined to meet with him.

may have retained his own expert to testify as to subsections (6) and (9) if he had known the State would seek adjudication findings, but he does not identify the witnesses, nor does he suggest what they or the expert would have said.[18] More significantly, Philip does not claim that he would have introduced any more evidence as to subsection (8)(B)(i-iii). Because an adjudication finding under (8)(B)(i-iii), alone, would be sufficient to uphold the superior court's decision, we conclude that Philip has not shown he suffered any actual prejudice as a result of the State's request that the superior court enter adjudication findings at the conclusion of the subject hearing.

### B. Philip Was Not Denied The Right To Present A Closing Argument.

■ Philip claims that he was denied due process because he was not allowed to present a closing argument at the end of the contested hearing. He cites *Herring v. New York* for the proposition that closing arguments are part of the right to assistance of counsel under the Sixth Amendment in criminal cases.[19] He also cites *In re Emileigh F.*, where a Maryland court held that litigants in CINA cases have the right to an opportunity to make closing arguments as a matter of Maryland common law.[20]

The missing foundation to Philip's argument is a request to present a closing argument. Several courts have held that the failure to request closing argument is sufficient to waive the right.[21] The December 3 hearing ended without mention of a closing argument from Philip's counsel. That the

superior court did not actively seek a summation from the parties was to be expected; the court had not yet decided whether the oldest girls' testimony would be admitted as a part of the State's case. The superior court did not rule on Philip's motion to strike their testimony because Philip had requested an opportunity to file a brief in support of his motion.[22] In the two months after the close of the hearing and before the superior court's decision, Philip completed briefing on the motion to strike, but he did not request the opportunity to present a closing argument. Thus, even if Philip could show that he had an absolute right to present an oral or written closing argument at the adjudication phase of this case, he waived the right by failing to request the opportunity to present one.

### C. Because The Superior Court Did Not Commit Error In This Case, There Was No Cumulative Error.

Philip argues that even if none of the superior court's errors individually constitutes a violation of due process, taken cumulatively, they require reversal. Because we discern no error by the superior court, we hold that there was no cumulative error.

## V. CONCLUSION

We AFFIRM the order of the superior court adjudicating all of the parties' children to be children in need of aid.

WINFREE, Justice, dissenting.

---

**18.** At the close of the hearing, Philip's counsel stated that he did not have any further evidence "for purposes of probable cause." Philip asserts that this statement "strongly suggests that he would have had evidence to present for purposes of adjudication." However, in context, it appears that Philip's counsel was distinguishing evidence for the purposes of probable cause from evidence relating to visitation, not adjudication:

Court: ... any other evidence to present ... ?
...
Mr. Case: You know, I do have—no, not for purposes of probable cause. It—it's—I do have some thoughts about visitation issues as well here.

**19.** 422 U.S. 853, 865, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

**20.** 353 Md. 30, 724 A.2d 639, 644 (1999).

**21.** *U.S. v. Spears*, 671 F.2d 991, 994 (7th Cir. 1982); *People v. Manning*, 120 Cal.App.3d 421, 426, 174 Cal.Rptr. 625 (Cal.App.1981); *State v. Hebert*, 110 Hawai'i 284, 132 P.3d 852, 862 (2006).

**22.** Philip suggests that the State was allowed to present a closing argument, but what the State's attorney called a "brief closing" was actually only a reiteration of the findings the State sought, not an argument about the evidence that had been presented at the hearing. Philip did not respond, but there is no indication he was prevented from doing so.

WINFREE, Justice, dissenting.

I respectfully disagree with the court's conclusion that Philip's due process rights were not violated by the unannounced change of his probable cause hearing to an adjudication hearing.[1] It is true the Office of Children's Services (OCS) gave advance notice of its intent to seek adjudication findings rather than probable cause findings at the close of the hearing. But because the trial court, not OCS, ultimately determines whether to turn a probable cause hearing into an adjudication hearing, due process requires that *the trial court* advise a parent of its determination at a meaningful time rather than in a post-hearing adjudication decision.[2]

Although shortly before the hearing and in its pre-hearing memorandum OCS advised that it would seek adjudicatory findings, the record seems clear that the August 25 hearing was intended to be a probable cause and temporary custody hearing. The July notice for the August 25 hearing described it as a "contested [ ] probable cause hearing"; an order issued the same day set a separate adjudication hearing for September 28. OCS's August 11 motion requested leave to have witnesses testify telephonically "at the contested probable cause hearing" set for August 25. Philip agreed to some but objected to other telephonic testimony "at the hearing on probable cause" set for August 25. The order allowing telephonic testimony referred to "the probable cause hearing."

Philip's subsequent pre-hearing memorandum was based entirely on the hearing being held for the determination of probable cause.

During the August 25 hearing the trial court allowed certain telephonic testimony over Philip's objection because "[t]his is just a probable cause hearing."[3] Later in the hearing the trial court mentioned that OCS was seeking adjudication findings and stated that it "[didn't] want to argue about that now." At the close of the hearing the trial court inquired whether Philip might stipulate to probable cause, allowing the case to be moved to the adjudication stage. Although Philip agreed he may have conceded a probable cause finding under AS 47.10.011(8) (mental injury), no stipulation was made after another reference to OCS seeking adjudication findings. The hearing was then continued to late October, with the trial court noting that if agreement were reached by the parties it would "find probable cause and then ... would set [a hearing] for adjudication." At a late–September status conference on the date originally set for an adjudication hearing, the trial court again referred to the matter as a probable cause hearing. Shortly before the October hearing, the trial court issued an order denying Philip's motion to admit his deposition testimony in lieu of telephonic testimony at the "continued probable cause hearing."

When the hearing resumed on October 28, the trial court referred to it as "a continua-

---

**1.** A parent's interests in a probable cause hearing and an adjudication hearing are substantially different due to the evidentiary burden and possible consequences of each.

A "probable cause hearing" is a preliminary non-adjudicatory hearing governed by CINA Rule 10, entitled "Temporary Custody Hearing." At the conclusion of such a hearing, the trial court must order a child returned to the home and dismiss the underlying petition if the court "does not find probable cause to believe that the child is a child in need of aid under AS 47.10.011." CINA Rule 10(c). If the trial court does find probable cause, it must hold an adjudication hearing within 120 days, unless continued for good cause. AS 47.10.080(a).

An adjudication hearing is governed by CINA Rule 15, entitled "Adjudication Hearing." Such a hearing "is a trial to the court on the merits of the petition for adjudication" and OCS "has the burden of proving by a preponderance of the evidence that the child is a child in need of aid." CINA Rule 15(a) and (c). If OCS meets this

burden, the trial court can commit the child to OCS's care for up to two years. AS 47.10.080(c)(1).

**2.** The court characterizes Philip's due process argument as being that he did not know OCS was asking for adjudication findings. But Philip concedes he knew OCS requested adjudication findings—his due process argument is that the trial court (1) conducted the hearing as a probable cause hearing, and (2) never gave Philip notice that it was considering honoring OCS's request to make adjudication findings rather than probable cause findings, even at the conclusion of OCS's case when Philip stated that he did not intend to present evidence as to probable cause.

**3.** *See* CINA Rule 10(b)(3) (allowing otherwise inadmissible hearsay evidence in a probable cause hearing if it is "probative of a material fact, has circumstantial guarantees of trustworthiness, and the appearing parties are given a fair opportunity to meet it").

tion of the probable cause hearing." After further proceedings on October 29, the hearing was continued to December 3. On December 2 the trial court issued an order referencing "the October 29, 2010, probable cause hearing." Towards the December 3 hearing's conclusion, the trial court asked if there would be additional "evidence for probable cause, adjudication, whatever we're calling this?" Philip stated that he would not be presenting any evidence "for purposes of probable cause." The trial court did not respond with any indication it was considering making adjudication findings instead of probable cause findings. The trial court concluded the hearing by stating it would not "make any findings as to preponderance or probable cause at this point." On February 5, 2011, the trial court issued an adjudication order under CINA Rule 15.

OCS argues that although "[t]he trial court might have been clearer about its intentions," Philip knew the trial court "might issue an adjudication decision." But Philip knew only that OCS had requested the hearing be treated as an adjudication hearing. Philip was not given any indication by the trial court that it would honor that request. In my view it is a violation of due process when: (1) the trial court calls a proceeding a probable cause hearing throughout the presentation of OCS's case; (2) at the completion of OCS's case the trial court does not expressly advise the parent that it is considering making adjudication findings rather than probable cause findings; (3) the parent advises the trial court that he does not intend to present evidence on the issue of probable cause and the trial court makes no indication that it is considering making adjudication findings; and (4) the parent's first indication that the trial court actually considered the hearing an adjudication hearing comes in the adjudication decision.

Although it is OCS's job to prosecute its case, the trial court, not OCS, ultimately determines the nature of the findings the court will make arising out of the hearings before it. A parent should not be required to guess whether the trial court will honor an OCS request for adjudication findings at a probable cause hearing. "The fundamental requisite of due process of law is the opportunity to be heard."[4] This right is of "little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."[5] Putative notice given by the other party is not sufficient to satisfy due process concerns when the trial court informs a party that arguments are being heard and evidence taken on one issue, but makes a decision on another issue.

Implicit in the court's opinion is the idea that the trial court was not in a position to know whether it would enter adjudication findings until it had heard whether OCS's evidence would satisfy the higher burden of proof required for adjudication findings. This fails to acknowledge the trial court's duty to give Philip notice at the close of OCS's evidence that the court was considering such findings; due process required putting Philip on notice that he needed to present evidence to contest adjudication rather than probable cause.[6]

I would reverse the trial court's adjudication decision and remand for entry of an appropriate probable cause decision.

**4.** *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914)).

**5.** *Id.*

**6.** The court further supports its decision by finding Philip failed to show that he was prejudiced by the trial court's lack of notice. However, the prejudice analysis "is not the same as determining whether any constitutional error was harmless, but more fundamentally considers whether lack of notice might deprive a parent of sufficient *opportunity* to prepare her case." *D.M. v. State,*

*Div. of Family & Youth Servs.*, 995 P.2d 205, 213 (Alaska 2000) (emphasis added) (citations omitted). While due process is contextually based and flexible, "it is at bottom an interest analysis, not an outcome analysis. It focuses not on whether a procedural error produced an unfair outcome but rather on whether the error produced an unjustifiable *risk* of erroneously denying a protected interest in the specific procedural setting at hand." *D.M.*, 995 P.2d at 219 (Bryner, J., dissenting) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)) (emphasis in original).